# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **ALLEN R. SCHULTZ,** | ) |
| **Plaintiff,** | ) |
| | ) **Case No. 2:18-CV-01598-CLM** |
| v. | ) |
| **METRO TRUCK RENTAL INC.,** | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Metro Truck Rental ("Metro") employed Allen Schultz ("Schultz") as a customer service manager for several years. Schultz sues Metro, alleging it wrongly terminated him in violation of the Age Discrimination in Employment Act ("ADEA") and the Americans with Disabilities Act ("ADA"). For the reasons stated within, the court **grants** Metro's motion to summarily dismiss the ADEA claim but **denies** Metro's motion to summarily dismiss the ADA claim.

## STATEMENT OF THE FACTS

<u>Metro's Corporate Structure</u>: Metro Truck Rental is one of several "Metro companies."[1] Although each Metro company has a separate bank account to pay employees, they share common management. For instance, Edwin Lumpkin is the

---

[1] For brevity's sake, this order will sometimes refer to Defendant Metro Truck Rental as "Metro," not to be confused with the broader network of organizations referred to in the parties' briefs as "Metro companies."

CEO of all Metro companies. And although she formally lacks a title, Maria Wiggins oversees accounts payable, expenses, and taxes for all Metro companies.

Another company included in the "Metro companies" network is Metro Mini Storage. Metro Mini Storage and Metro Truck Rental typically occupy the same office buildings in adjoining spaces, and on-site employees often perform duties for both. Plus, the Metro company account that generates employees' paychecks does not necessarily reflect the actual work performed by those employees.

In other words, Metro Truck and Metro Mini Storage operate symbiotically. In fact, in her deposition, Wiggins characterized the truck rental operation as having a symbiotic relationship to the larger storage locations, while in the smaller storage locations, Metro provides the truck rentals merely as a "courteous service for the customer."[2] Although there appears to be some dispute as to how many employees Defendant Metro Truck Rental has by itself, Metro Truck Rental and Metro Mini Storage combined employ over 50 employees.

Schultz's Employment: Metro employed Allen Schultz, a 74-year-old man, in a customer service capacity for several years. In April 2017, Schultz left Metro—the dispositive question is why. Schultz says Metro terminated him. Metro says Schultz voluntarily retired. Both parties agree that Metro provided Schultz with a $5,000

---

[2] At least one Metro employee's business card lists the company as "Metro Mini Storage and Truck Rental." That said, the court notes that the Metro location at which Schultz worked did not have a storage location attached to it.

check, which Metro contends was a retirement gift but Schultz contends was a severance payment.

Several months before Schultz left Metro, Shane Sisk – who performed scheduling for Metro and Metro Mini Storage – decided to reduce Schultz's hours, citing a slowdown in business. Though Sisk stated that other employees saw their hours reduced as well, Metro never identifies those employees. Sisk testified that at that time, he did not know about Schultz's various health problems.[3] But Sisk also testified that Schultz later told him that he had been diagnosed with cancer, would need to be out for some indefinite period, and needed money to cover the resulting medical bills which he would accept in the form of a retirement check.

Schultz, by contrast, testified that he never disclosed his cancer to Sisk and that he only mentioned his diagnosis to Metro employee Rowe Thomas. Schultz also claims that he only missed two days of work for surgery on the cancer, never asked for financial assistance as a result, never suggested to anyone that he wanted to retire, and was told by Sisk after his surgery that Metro was terminating him.

The $5000 check: According to Sisk, Lumpkin (the CEO) decided to give Schultz a $5,000 retirement gift once he knew about the cancer diagnosis. Sisk also stated that Schultz had asked him when he would receive the check, to which he

---

[3] That said, Sisk also acknowledges having limited Schultz's work responsibilities following the hip surgery he had in 2016.


responded that it would be on Schultz's last day of work, April 1. Wiggins labeled the check: "Final Expense reimbursement." Metro says that it did not title the check a "retirement gift" for tax purposes. Metro also admits that no document in the record says that the $5,000 check was related to Schultz's "retirement."

Metro had previously paid Schultz outside his standard paycheck. Schultz classifies these previous payments as advances on his wages and health insurance contributions, while Metro characterizes them as "loans." The parties do not dispute that in one particular instance, Lumpkin (the CEO) personally loaned Schultz $10,000 to redeem Schultz's house. Schultz also states that, two weeks before Sisk told him that Metro was terminating him, Schultz requested from Wiggins another advance on his insurance reimbursements to cover his wife's medical bills. An email of this exchange reveals that Wiggins told Schultz that she could not advance Schultz any money. Wiggins also said,

> With all your and Marilyn's health problems, I really think you two should consider disability and get your Social Security. We wouldn't fight unemployment if you wanted to go that route. Living behind the eight ball all the time like you are is not helping your personal being.

Ten days later, Schultz again emailed Wiggins asking for an advance on his insurance reimbursements and a payday loan, this time disclosing his diagnosis with a bladder tumor. The record does not show whether this request was denied.

The parties also disagree as to whether Metro hired a younger, non-disabled employee around the time of Schultz's separation. While Metro states that it didn't, Schultz points to Metro's Employee Contact List to suggest that it did.

## STANDARD OF REVIEW

Summary judgment is appropriate only when the moving party shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In turn, to avoid summary judgment, the nonmoving party must go beyond mere allegations to offer specific facts creating a genuine issue for trial. *Id.* at 324. Moreover, all evidence must be viewed and inferences drawn in the light most favorable to the nonmoving party. *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1149 (11th Cir.2005). When no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## ANALYSIS

### 1. Metro's Employer Status

Metro argues that it does not have enough employees to fall under the definition of "employer" for either the ADA or ADEA. Doc. 28. If Metro is correct, the court needn't address the merits of Schultz's claims. So the court starts here.

The ADA provides that an entity must have 15 employees to qualify as an employer, while the ADEA requires 20. 42 U.S.C. §12111; 29 U.S.C. § 630. If an entity does not have the requisite number of employees, it is not an "employer" and is not bound by either statute.

The parties dispute how many people Defendant Metro Truck Rental alone employs.[4] But this fact is not determinative. The Eleventh Circuit recognizes that courts can consider facially discrete entities together for purposes of counting employees under the "single employer" test. *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir.1999).[5] This test holds that, where two entities are "'highly integrated with respect to ownership and operations,'" courts may consider them together. *McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir.1987) (quoting *Fike v. Gold Kist, Inc*., 514 F.Supp. 722, 726 (N.D.Ala.), *aff'd*, 664 F.2d 295 (11th Cir.1981)). If the number of employees between the "highly integrated" entities meets the statutory requirement, the court should consider the entity an "employer" covered by the statute. *Lyes*, 166 F.3d at 1341.[6]

---

[4] Though Metro's answer "admits" to having over 100 employees, it later says is has only 13 (and the record makes clear Metro does not employ 100 employees).

[5] Though the Eleventh Circuit first applied this test to a Title VII suit, courts also regularly apply the test in the context of other employment statutes, such as the ADA, in which the definition of "employer" is identical to the definition in section 2000e(b) of Title VII. 42 U.S.C. § 12111(5)(A). *See Walker v. Boys and Girls Club of America*, 38 F. Supp. 2d 1326, 1335 (M.D. Ala. 1999).

[6] To be clear, the test does not require that both entities employ the plaintiff—employment by one will suffice. Contrast this with the "joint employer" test, which presumes the employee is in some sense employed by both entities. *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1359 n.6 (11th Cir. 1994) ("A 'joint employer' relationship is different from, though sometimes confused with, a 'single employer' situation.") (citing *Clinton's Ditch Coop. Co. v. National Labor Relations Bd.*, 778 F.2d 132, 137 (2d Cir.1985)).

The Eleventh Circuit uses four factors to make this determination: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *McKenzie*, 834 F.2d at 933.

Applying these factors, the court finds that Metro Truck Rental and Metro Mini Storage function as a single employer for purposes of ADA and ADEA liability. The companies share common management, both are organized under Lumpkin Development, and Wiggins serves as the chief financial officer for both. Docs. 28-3, 28-4. At most locations, the two companies occupy adjoining office spaces and often share employees. Doc. 28-4. In fact, Wiggins acknowledged that the company to which a given employee is "assigned" does not always reflect the true work that employee performs. Doc. 28-3. Instead, employee assignment is largely an accounting exercise. *Id.* The record identifies several employees who mainly work for one company but receive a paycheck from the other. Doc. 28-4.

Wiggins explained that the truck rental and storage services function symbiotically:

> Every store is there as a mini storage first and foremost. The truck rental is secondary. So most of the time, if it was a one-manager store, the truck rental was almost non-existent. It was more of a courteous service for the customer.

Doc. 28-3, pp. 18-19. Wiggins also said that, in larger locations that required two managers, she would "split those managers between the two companies to represent

more accurately the revenues and expenses related to those particular company functions." *Id.* In line with Wiggins' testimony, at least one employee's business card lists his employer as "Metro Mini Storage and Truck Rental." Doc. 28-1. This employee – Shane Sisk – also performs scheduling for both entities. *Id.*

Simply put, the two Metro companies operate as a single entity. The companies share management, ownership, employee labor, operational goals, and in most locations appear to carry on as a single business. And when you add the employees of Metro Truck Rental and Metro Storage together, Metro has enough employees to be covered by the ADEA and ADA.

**2. ADEA Claim**

The ADEA prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Schultz argues that Metro violated the ADEA by firing him because of his age.

1. <u>Legal framework</u>: If a plaintiff has direct evidence of discrimination (and Schultz does not), he can make out a prima facie case of age discrimination through circumstantial evidence. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). Consistent with the *McDonnell Douglas* framework, the defendant may then rebut with a legitimate, nondiscriminatory explanation for the action taken.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff then has the final burden to offer evidence that the defendant's proffered explanation is pretext for discrimination. *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207–08 (11th Cir.1997).

In the first step, a plaintiff may establish a prima facie case of discrimination by showing that: (1) he was a member of the protected age group; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was replaced by a younger individual. *Shrock v. Public Super Market, Inc.*, 653 Fed.Appx. 662, 664 (11th Cir. 2016). The court stops at this first step because Schultz cannot meet it.

2. Applying the facts: Schultz fails to argue – much less provide evidence – that Metro replaced him with a younger individual. Schultz's only reference to younger employees comes in noting that Metro hired some younger employees after he left. Doc. 30, p. 12. But simply noting that Metro hired some employees under the age of 74 after Schultz left, without more, would not prove that Metro hired those employees to replace Schultz. Nor does Schultz make this argument. So Schultz fails to make a case under *McDonnell Douglas*.

Instead, Schultz appears to rely on a "but-for, totality of the circumstances" test to support his ADEA claim. Doc. 30, pp. 27-28. This is not a test the Eleventh Circuit uses to assess ADEA claims, though it does resemble the "convincing

mosaic" analysis recognized by the Eleventh Circuit as a viable way to prove age discrimination. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).

Assuming that Schultz's ADEA claim hinges on a "convincing mosaic" argument, it fails. Schultz's ADEA claim – like his ADA claim – hinges on a dispute over whether Schultz retired (as Metro contends) or was wrongly terminated (as Schultz contends). Doc. 30. But even if Schultz could prove that he was fired, he presents no evidence—nor is there any reason to believe—that Schultz's *age* motivated Metro's decision to fire him. Schultz relies solely on speculation that is neither 'convincing' nor a 'mosaic'.

To be sure, age (ADEA) and disability (ADA) claims may coexist, but there must at least be *some* evidence that age was the reason for termination. Schultz has offered none. So his ADEA claim is due to be dismissed.

### 3. ADA Claim

The court reaches the opposite conclusion for Schultz's "regarded as" disability claim under the ADA. *See* 42 U.S.C. §12102(1)(C).

1. <u>Legal framework</u>: The Eleventh Circuit also uses the *McDonnell Douglas* framework to analyze ADA claims. To make a prima facie case, the plaintiff must show: (1) a disability; (2) that the employee was otherwise qualified to perform the essential functions of the job; and (3) that the employer discriminated against the employee based on the disability. *McDonnell Douglas*, 411 U.S. at 792; *Williams v.*

*Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002). If he does, the defendant must then proffer a nondiscriminatory explanation, which the plaintiff can rebut with evidence of pretext.

As with his ADEA claim, however, Schultz does not use the *McDonnell Douglas* framework in making his case. He instead relies on what amounts to the "convincing mosaic" standard (though he does not call it that). Doc. 30. Under this standard, courts should deny summary judgment if "a convincing mosaic of circumstantial evidence [exists] that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The type of evidence that may support this inference includes, "suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn." *Lewis v. City of Union, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011).

2. <u>Applying the facts</u>: Schultz presents enough "bits and pieces" of evidence, *id.*, that when put together, would allow a reasonable jury to find that (a) Metro regarded Schultz as disabled and (b) Metro fired Schultz because of his perceived disability. Schultz's evidence focuses on Metro's response to his hip surgery and tumor removal.

Schultz first points out that his manager, Rowe Thomas, cut back on Schultz's duties following Schultz's hip surgery, despite Schultz's claim that he remained fully functional. Metro maintains that Thomas's decision stemmed from a slowdown in business, though it never identifies any other affected employees. Doc. 30. Thomas's decision caused Schultz to spend a greater portion of his day sitting down, rather than moving around, checking in and inspecting trucks, and doing other aspects of his job that required being on his feet. *Id.* CEO Edwin Lumpkin – who, along with Shane Sisk, made most personnel decisions at Metro – testified that, when he observed this situation, he at first assumed Schultz simply *couldn't* do these things. Doc. 28-4. Lumpkin testified that "[Schultz] couldn't go out to the truck to pull it around or bring it around. I mean, he just couldn't do that." *Id.* He also testified that he did not know that anyone had restricted Schultz's duties until Schultz's attorney told him during his deposition. *Id.*

Eventually, Lumpkin stated, Metro had to hire another employee at Schultz's store to do the work Schultz himself could not or would not do. *Id.* Lumpkin explained that decision was because "[Schultz] wouldn't do any work." *Id.*[7] At around the same time, and not long before Schultz's employment ended, Metro reduced Schultz's work schedule from four days a week to three. Doc. 28-1. Metro

---

[7] Asked later whether he considered Schultz to have a disability, Lumpkin responded that he believed Schultz was just lazy. Yet Lumpkin also stated in his deposition that he "would not have fired [Schultz] for any reason. There's no reason I could think of that I would fire him." Doc. 28-4.

stated this change gave Schultz more time to schedule his doctor's appointments, though Schultz disputes ever needing or requesting this additional time off. Docs. 28, 30.

Schultz next points to an email exchange with Wiggins (Metro's CFO) that occurred shortly before he left Metro. Doc. 28-3. Schultz explained in the email that he needed the money to pay for his wife's medical bills. *Id.* Wiggins denied the request, stating,

> With all your and Marilyn's health problems, I really think you two should consider disability and get your Social Security. We wouldn't fight unemployment if you wanted to go that route. Living behind the eight ball all the time like you are is not helping your personal being.

Doc. 28-3. Schultz contends that, a few days later, he informed Wiggins that he required surgery to remove a bladder tumor and again requested an advancement. Doc. 1. Following the surgery, Schultz says that Sisk told him Metro was terminating him and his last day would be April 1st. *Id.*

Metro disputes that this last conversation took place. But Metro doesn't dispute that it reduced Schultz's work duties and hours shortly after he underwent hip surgery and around the same time that its CEO formed the belief that Schultz physically could not get out of his chair. This series of events also occurred shortly before Metro's CFO encouraged Schultz to "consider disability" and apply for social security or unemployment benefits. These bits and pieces of evidence are the kinds

of "suspicious timing[s]" and "ambiguous statements" that can support an inference of discrimination. *Lewis*, 934 F.3d at 1185. *See generally Norris v. GKN Westland Aerospace, Inc.*, 921 F. Supp. 2d 1308 (M.D. Ala. 2013) (holding that employer who transferred employee following discussion of employee's medical conditions while other employees were not transferred created circumstantial evidence of discriminatory intent).

Now, a jury might find this evidence is just a series of coincidences. And a jury might agree with Metro that Schultz was simply a poor worker, so Metro was justified in limiting Schultz's duties and hours. But Metro does little to convince the court that its version of events is undisputed, leaving a jury with no choice but to vote Metro's way. For starters, Metro did not reply to Schultz's brief in opposition, which lays out Schultz's factual narrative, despite the court setting Metro's deadline for filing a reply brief after a status conference. Docs. 31-32.

Instead, Metro relies on its opening brief, in which Metro argues that Schultz cannot satisfy the first step of *McDonnell Douglas* because, among other reasons, Schultz did not request an accommodation; Schultz did not try to return the $5,000 check; and Schultz did not try to work again at Metro. Doc. 29, p. 19. In other words, Metro rests on its argument that all of the evidence points to its version of events (retirement), not Schultz's (termination). *Id.*

That means that Metro has not confronted the evidence that Schultz says supports a "regarded as" termination claim. For example, Schultz says that it is an undisputed fact that "he was able to perform all of the duties of his job, however, Thomas and Sisk placed restrictions on what Schultz was permitted to do." Doc. 30, ¶22. Without a reply, the court must assume that Schultz is factually correct: Metro wrongly regarded Schultz as disabled after his hip surgery.

Metro's failure to address Wiggins' emails is even more damaging to its motion. Schultz says that it is undisputed that Wiggins told him to consider seeking "disability" and that Metro "wouldn't fight unemployment if [Schultz] wanted to go that route." *Id.* ¶25. Schultz also says that it is undisputed that Metro knew about his tumor being removed and fired him the day before he was supposed to come back. *Id.* ¶¶27-29. Metro does not confront either of these "undisputed" facts.

Metro also fails to confront Schultz's point that Metro told the Alabama Department of Labor that it "laid off" Schultz over a "lack of work"; even though the form offered "employee voluntarily quit available work" as an option:

> 4. Employee's work status (select one):
> ☐ Still working
>     ☐ *full time*           ☐ *on call*
>     ☐ *part-time*           ☐ *seasonal employment*
> ☐ Quit *(employee voluntarily quit available work)*
> ☐ Discharge *(you fired this employee)*
> ☒ Laid Off *(reduction in force, lack of work, company down-sized)*
>
> If one of the above boxes is checked, please enter the date that this individual separated from your employ: ___3.31.2017___

Doc. 28-2 at 114. In other words, Metro doesn't respond to documentary evidence that suggests Metro terminated Schultz, not that Schultz retired.

If these facts are undisputed—and, without Metro filing a reply, the court must assume that they are—a reasonable juror could find that Metro fired Schultz because it didn't want an employee with a bad hip and cancer issues. That's enough to survive summary judgment.

\* \* \*

Schultz's ADA claim boils down to which story one believes: Did Schultz retire to receive a severance check or did Metro fire him because he was disabled? The court denies summary judgment because the conflicting evidence allows a reasonable juror to choose either story.

## CONCLUSION

For the reasons stated above, Metro's motion for summary judgment as to Count I is due to be **granted**, and its motion for summary judgment as to Count II is due to be **denied**.

The Court will enter a separate order.

Done on December 7th, 2020.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE